IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTONIO ALEVRAS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 13 C 8409 |
| v. ) | |
| ) | Magistrate Judge Sidney I. Schenkier |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Antonio Alevras has filed a memorandum (doc. # 18: Pl. Br. in Support of Reversal) requesting that we reverse or remand the final determination by the Commissioner of Social Security ("Commissioner"), denying his application for Disability Insurance Benefits ("DIB"). The Commissioner has filed a motion seeking affirmance of the decision denying benefits (doc. # 25: Def. Mot. for Summary Judgment) and Mr. Alevras has filed a reply (doc. # 33: Pl. Reply). Because the Appeals Council declined Mr. Alevras' request for review (R. 1-3), the ALJ's ruling represents the Commissioner's final decision. *O'Connor–Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir.2010). For the following reasons, the Court remands this case for further consideration.

I.

Mr. Alevras filed a claim for DIB on January 29, 2011, alleging a disability onset date of April 1, 2005 (R. 141). At the hearing, he amended his onset date to September 22, 2006, the

---

[1]On December 17, 2013, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 8).

date of his heart attack.[2] His date last insured was December 31, 2008, and so Mr. Alevras had to be found disabled between his onset date and his date last insured to be eligible for benefits. His claim was denied initially and on reconsideration, and a hearing was held before an ALJ on June 28, 2012. In a written opinion issued on July 27, 2012, the ALJ concluded that Mr. Alevras was not disabled during the time period between his alleged onset date and his date last insured (R. 11-20).

## A.

In her opinion, the ALJ characterized the objective signs and findings of Mr. Alevras' physical impairments as "not particularly adverse," before summarizing the medical evidence related to Mr. Alevras' heart disease (R. 68). Specifically, the ALJ recounted the following medical information from the time during and immediately after the claims period:

- In September 2006, Mr. Alevras was hospitalized for congestive heart failure and coronary artery disease; at the time, his heart had an ejection fraction of 30% (R. 68, 260, 279).[3]

---

[2]There is substantial inconsistency in the record with respect to the date Mr. Alevras first filed for DIB and the date he alleges he first became disabled. At the hearing, the ALJ commented that Mr. Alevras alleged an onset date of August 26, 2005, the date listed in the "Disability Determination and Transmittal" document from the Commission (R. 28, 51). However, in two "Disability Determination Explanation" documents from the Commission (one for the initial determination on April 4, 2011 and one for the reconsideration on July 7, 2011), the alleged onset date is April 1, 2005 (R. 47, 52). In a January 29, 2011 "Application Summary for Disability Insurance Benefits" completed by the Commission after interviewing Mr. Alevras, the date he allegedly became unable to work is stated as October 1, 2006 (R. 125). Given that Mr. Alevras amended his onset date at his hearing, we will use September 22, 2006 – the date he went to the emergency room in heart failure – as the start of his alleged period of disability.

[3]"Ejection fraction" is a measurement of the percentage of blood leaving the heart each time it contracts. The left ventricle is the heart's main pumping chamber, so ejection fraction is usually measured only in the left ventricle (LV). An LV ejection fraction of 55 percent or higher is considered normal. An LV ejection fraction of 50 percent or lower is considered reduced. http://www.mayoclinic.org/ejection-fraction/expert-answers/faq-20058286 (visited on April 27, 2015). According to the American Heart Association, an ejection fraction under 40 percent may be evidence of heart failure or cardiomyopathy heart disease. http://www.heart.org/HEARTORG/Conditions/HeartFailure/SymptomsDiagnosisofHeartFailure/Ejection-Fraction-Heart-Failure-Measurement_UCM_306339_Article.jsp (visited on April 27, 2015). Furthermore, an ejection fraction less than 35 percent puts a patient at risk of a life-threatening irregular heartbeat that could lead to sudden cardiac arrest. http://my.clevelandclinic.org/services/heart/disorders/heart-failure-what-is/ejectionfraction (visited on April 27, 2015).

- Upon being hospitalized, Mr. Alevras underwent coronary by-pass surgery with graft and placement of an aortic balloon (*Id.*).

- Within days of surgery, S. Dundoulakis, M.D. assessed Mr. Alevras's heart ultrasound as showing "no significant stenosis or abnormalities", but noted that his exam was limited because Mr. Alevras was on a balloon pump (R. 68, 239).

- An echocardiogram performed on September 23, 2006 and interpreted by Purshotam Sawlani, M.D., showed a mildly dilated left ventricle, moderate hypokinesia, mild nitro regurgitation, and minimal tricuspid regurgitation, with otherwise normal studies (R. 68, 241).

- Lab results in October 2006 showed abnormalities in Mr. Alevras' cholesterol, triglycerides, glucose, creatine, hemoglobin, and platelet count (R. 68, 244).

- Helen Ho, M.D., interpreted a chest x-ray from October 2006 as having residual infiltration and fluid at the lung bases, but improved over another x-ray taken in September 2006 (R. 68, 246).

- A December 2007 chest x-ray revealed post-surgical changes and calcification of the aorta (R. 68, 224).

- In July 2009, a chest x-ray interpreted by Jeremy Simon, M.D., showed myocardial effusion wall motion, and an ejection fraction test showed partially reversible small, moderately severe perfusion defect, with an abnormally low ejection fraction of 34% (R. 68, 418).

- In October 2009, Mr. Alevras had another echocardiogram which revealed a moderately dilated left ventricle and left atrium and mild to moderate global hypokinesia. He also had a stress test which was stopped after four minutes due to fatigue but was otherwise unremarkable (R. 68, 446-47).

**B.**

In addition to her recitation of the above medical evidence, the ALJ also discussed other medical treatment Mr. Alevras received, although her characterization of such treatment contains a number of errors. *First*, the ALJ stated that Mr. Alevras was followed by Dr. Sawlani from September 2006 until January 2011 (R. 68). She summarized several pages of handwritten treatment notes from 2006 through 2011 that she ascribed to Dr. Sawlani (even though they contain no identifying information at all), which show that Mr. Alevras saw a doctor about every

three months during that time span and continued to have coronary artery disease, hypertension, diabetes, chronic renal failure and high cholesterol, but no edema or chest pain (R 364-74). But, during the hearing, Mr. Alevras identified Dr. Sawlani as his cardiologist and testified that he did not see him regularly after his heart attack.[4] The ALJ stated during the hearing that she hadn't seen any notes from Dr. Sawlani in the file. The ALJ failed to explain in her opinion how or why she decided that the unidentified 2006-2011 treatment notes were from Dr. Sawlani, particularly in light of Mr. Alevras' testimony that he did not see a cardiologist regularly during that time frame (R. 30).[5]

*Second*, the ALJ also discussesd two pages of unidentified notes that she ascribes to Anastaisos Trontsos, M.D., whom the ALJ incorrectly characterizes as a doctor who saw Mr. Alevras three times in May and June 2011 as a consultative examiner with respect to Mr. Alevras' claim for disability (R. 68, 389-390, 394). In fact, during the hearing, the ALJ identified Dr. Trontsos as Mr. Alevras' primary care doctor and Mr. Alevras agreed that he saw Dr. Trontsos regularly throughout the claims period (R. 30). Dr. Trontsos was also the attending doctor when Mr. Alevras first had his heart attack in 2006 (R. 261). The notes – which are from May and June 2011 and are very difficult to read – reflect that at the time, Mr. Alevras was able to walk about ½ mile at a time, had not experienced weight loss, and was not engaging in exercise or watching his diet (R. 394). They also contain the notation "last seen by \_\_\_\_\_ 2 years ago", although the name of person Mr. Alevras had last seen is not discernable (*Id.*).[6]

---

[4]There are no medical records conclusively attributable to Dr. Sawlani between October 2006, when he was treating Mr. Alevras for his heart attack, and October 2009, when he performed a stress test on Mr. Alevras.

[5] These notes list the medications Mr. Alevras was taking to treat his heart problems (Simvastatin, Furosemide, Nifedipine, Metoprolol, Digoxin, Amaryl and Lisinopril, among others), mention occasional, mild leg edema and lung crackles, and record his blood pressure. The notes contain no medical impressions or opinions (*Id.*).

[6]In her opinion, the ALJ interprets the notation as saying Mr. Alevras was "last seen by a doctor two years ago" (*i.e.*, sometime in 2009) (R. 68). This conclusion is patently incorrect, as we note the ALJ recognizes in the

In May 2012, Evangelos Biscotakis, M.D., who began treating Mr. Alevras in May 2011, provided a residual functional capacity ("RFC") assessment, which is the only one in the record, that opined Mr. Alevras was capable of a low stress job and could walk ½ block before becoming short of breath. The RFC also stated that Mr. Alevras could sit for more than two hours, stand for 15 minutes before needing a break, and stand/walk for less than two hours total in an eight hour workday (R. 474-75). It also said that he should be allowed to walk for two to five minutes every 90 minutes, could never lift more than 20 pounds and rarely lift 10 pounds, and would need to take unscheduled breaks and elevate his legs (R. 473-77). The ALJ gave Dr. Biscotakis' opinion no weight because it was rendered after the date last insured (R. 69).

The ALJ also recounted Mr. Alevras' testimony that he was unable to work because of difficulty breathing, swelling in his legs, fatigue, dizziness, and an inability to stand for very long (R. 31-32, 37, 69). The ALJ did not find the degree of limitation assessed by Mr. Alevras to be credible. She referred to a six-week trip to Greece Mr. Alevras took in June 2007, although she did not discuss Mr. Alevras' testimony that he spent the majority of the trip sitting in his mother's home or in her village while relatives came to visit (R. 35-36). The ALJ also did not mention Mr. Alevras' testimony that during the claims period, he was unable to walk a mile without stopping to rest several times, could not walk up and down the stairs at home, was unable to help his wife with household chores or do yard work, and needed her help to shower (R.33-36).

## II.

In her decision, the ALJ followed the familiar five-step process for determining disability, 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a). At step one, she found that Mr. Alevras

---

same paragraph of her opinion that Mr. Alevras was followed by a doctor from 2006 to 2011, and handwritten treatment notes reflect a number of appointments in 2010 (R 364-66).

did not engage in any substantial gainful activity between his onset date in September 2006 and his date last insured of December 31, 2008 (R. 66). She determined at steps two and three that Mr. Alevras had the severe impairments of coronary artery disease, non-insulin dependent diabetes, and obesity, but that none of them met or equaled a listed impairment under 20 CFR §§ 404.1520(d), 404.1525, or 404.1526 (*Id.*). Next, the ALJ determined that during the claims period, Mr. Alevras had the RFC to perform light work as defined in 20 CFR § 404.1567(b) except that he could only occasionally stoop, kneel, climb crouch and crawl (R. 67).[7] Therefore, she concluded that Mr. Alevras was able to return to his previous work as a line cook or a baker's helper (R. 70).

In his motion for remand, Mr. Alevras argues that there is no basis for the ALJ's RFC determination, and that substantial evidence does not support her conclusion that Mr. Alevras was not disabled. Social Security Act, 42 U.S.C. § 405(g), requires us to uphold the findings of the Commissioner if they are supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Therefore, we will reverse the Commissioner's findings only if they are not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In doing so we may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir.2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007)). Instead, we will "examine the ALJ's decision to

---

[7]According to social security regulations, light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." http://www.ssa.gov/OP_Home/cfr20/404/404-1567.htm (visited on March 6, 2015).

determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings" and thus give Mr. Alevras meaningful judicial review. *Moore v. Colvin*, 743 F.3d 1118, (7th Cir. 2014).

### A.

In determining a claimant's RFC, an ALJ must base her decision on medical evidence as well as "other evidence, such as testimony by the claimant or his friends and family." *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). While an RFC determination need not address every single piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling. *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In this case, the ALJ's errors extended to her consideration of both the medical and non-medical evidence.

The first problem with the ALJ's determination of Mr. Alevras' RFC during the claims period is that her perfunctory summary of the medical evidence – even apart from the factual errors she made in summarizing it – does not fulfill her duty to build a "logical bridge" between the evidence and her conclusions. Yes, the ALJ summarized much of Mr. Alevras' medical history; but, merely summarizing medical evidence is not the same thing as analyzing it and explaining how the evidence supports the conclusion that the claimant is not disabled. *Perry v. Colvin*, 945 F.Supp.2d 949, 965 (N.D.Ill. 2013). With respect to a claimant's RFC, Social Security Ruling 96-8p requires the ALJ to include "a narrative discussion of why symptom-related functional limitations can or cannot reasonably be accepted as consistent with the medical and other evidence." *See, e.g. Mills v. Colvin*, 959 F.Supp.2d 1079 (N.D.Ill. 2013) (remanding case where ALJ summarized the medical evidence but did not explain how the evidence supported his assessment of the claimant's RFC).

7

There is only a single RFC opinion in the record: Dr. Biscotakis' 2011 opinion which opines that, at least as of that date, while Mr. Alevras could handle a "low stress" job, he would need to be able to take unscheduled breaks to elevate his legs, could only stand for 15 minutes at a time, and would need to be allowed to walk around every hour or two. Based on the hearing testimony of the vocational expert ("VE"), these limitations would prevent Mr. Alevras from returning to either of his previous jobs as a bakery helper or line cook (R. 42-44). The ALJ did not discuss the VE's testimony in her opinion and summarily rejected Dr. Biscotakis' RFC because it was rendered outside the claims period. This was error.

While we recognize that the 2011 RFC does not express a view as to Mr. Alevras' ability to work during the claims period, that does not mean the opinion cannot shed light on that question. A medical opinion rendered past the date last insured may be relevant if corroborated with evidence during the claims period. *See, e.g., Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998). In this case, the ALJ rejected Dr. Biscotakis' RFC simply because of when it was rendered; she did not discuss whether the opinions it contained were corroborated by any of the medical or other evidence from during the claims period. And, we note that other medical evidence – which the ALJ does not discuss – suggests that at least some of Mr. Alevras' current health problems were also problematic during the claims period.

For example, when Mr. Alevras first had his heart attack in 2006, his heart had an ejection fraction of 30 percent; it was still an "abnormally low" 34 percent in 2009. That is one piece of evidence suggesting that the condition in 2011 that imposed restrictions that the VE said would make Mr. Alevras unable to perform his prior work also may have existed (and imposed those same limitations) during the claims period. The ALJ did not consider whether such lack of

8

improvement in heart function during the claims period suggest that physical limitations noted by Dr. Biscotakis in 2011 could have existed prior to the date last insured as well.[8]

Moreover, once the ALJ rejected Dr. Biscotakis' RFC, she was left with no medical opinion at all on which to base her own RFC determination. Instead, she determined that Mr. Alevras was able to return to his previous work, without pointing to any evidence to support this conclusion. The ALJ did not, as she should have, "call[ed] a medical advisor and/or obtain[ed] clarification of the record to flesh out what she needed to support her decision." *Bailey v. Barnhart*, 473 F.Supp.2d 822, 839 (N.D. Ill. 2006)(*Schenkier, J.*). Instead, she impermissibly "played doctor" and came up with an RFC on her own – without explaining what medical and other evidence supported her conclusions.

The Seventh Circuit has explained that an ALJ improperly plays doctor when she substitutes her own opinion about a claimant's abilities for those of the medical professionals and fails to rely on other medical evidence in the record to support her decision. *Dixon v. Massanari*, 270 F.3d 1170, 1178 (7th Cir. 2001). *See also, Suide v. Astrue*, 371 Fed.Appx. 684 (7th Cir.2010) (ALJ may not substitute lay judgment for opinions in the record). In this case, once the ALJ rejected Dr. Biscotokis' RFC, she was left with no medical opinions at all on which to rely for her conclusions that Mr. Alevras' condition was not severe or that he was able to perform jobs at the light exertion level.

Although lacking any direction from a medical expert, the ALJ opined that the "objective signs and findings were not particularly adverse" and that Mr. Alevras' heart condition was of a "relatively mild to moderate nature" (R. 68, 70). The medical evidence in the record does not

---

[8]We recognize that the ALJ was within her discretion to reject Dr. Biscotakis' RFC if she found that it had no bearing on Mr. Alevras' ability to work during the time period. But she could only make such a determination after considering what the RFC said and how it did or did not relate back to Mr. Alevras' condition prior to the date last insured.

9

support such an unequivocal determination. Although some of the medical records reflect improvement in Mr. Alevras' condition over previous tests, others discuss abnormal lab results, calcification of the aorta, and an "abnormally low" ejection fraction of 34 percent.[9] The ALJ did not explain how she evaluated the medical evidence to come to her determinations.[10]

Furthermore, the ALJ did not address other, non-medical evidence when determining Mr. Alevras' RFC. During the hearing, Mr. Alevras testified that his ability to perform household tasks during the claims period was limited: he could not walk up and down the stairs at his home, he could not help his wife with chores or yard work, and needed help showering (R.33-36). But the ALJ does not mention this testimony in her opinion. Instead, she only mentions a function report Mr. Alevras (through his son) completed in March 2011 in which he stated he could take care of his personal needs, do light house cleaning, drive a car, and go shopping for several hours per week (R. 69 and 154-160). It is not clear from the ALJ's opinion or the transcript of the proceeding if Mr. Alevras completed the function report based on his abilities in 2011 or for the time during the claims period and the ALJ did not question Mr. Alevras about the report during the hearing.[11]

---

[9]We recognize that Mr. Alevras's ejection fraction of 34 percent is from a July 2009 medical visit – six months after his date last insured. But, given that his injection fraction was 30 percent in September 2006, when he was first admitted to the emergency room suffering from a heart attack, the ALJ's characterization of Mr. Alevras' heart problems as "not particularly adverse" is troubling.

[10]Additionally, the mere fact that a claimant is evaluated as "stable" or even "improving" does not mean that he or she is therefore able to work. As the Seventh Circuit has pointed out, a claimant could be in terrible condition immediately after a medical event (such as Mr. Alevras' heart attack), be judged as having improved at a later date, and still be unable to work despite such improvement. *See, Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014).

[11]The ALJ also does not address Mr. Alevras' hearing testimony that currently (that is, at the time of the hearing), he was feeling better and his symptoms were less intense than during the 2006 – 2008 time period (R. 38). While we cannot conclude if such testimony means that the 2011 function report actually reported Mr. Alevras' physical limitations and abilities as of 2011 and not from during the claims period, it does suggest a line of evidence and questions that the ALJ overlooked with respect to Mr. Alevras' physical limitations and symptoms prior to his date last insured, and which could have been relevant to the determination of his RFC.

## B.

The plaintiff also raises concerns about the ALJ's credibility analysis, which deserve brief mention. We will uphold an ALJ's credibility determination unless it is patently wrong, which means that the decision lacks any explanation or support. *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir.2008). In drawing her conclusions, the ALJ must "explain her decision in such a way that allows us to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir.2011).

The ALJ concluded that Mr. Alevras' testimony about his physical limitations was not entirely credible because he declined to go to rehabilitation after his surgery, did not lose weight as recommended by his doctor, only saw his primary care physician and not his cardiologist, did not consistently take his blood pressure reading and visited his mother in Greece for six weeks in 2007. While an ALJ may consider noncompliance with treatment as a factor in determining credibility of a claimant's statements about his pain or symptoms, he or she must first make a determination about whether the noncompliance is justified and develop the record to support the finding. SSR 96-7p at *7; *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). In this case, the ALJ failed to fully develop the record with respect to Mr. Alevras' alleged non-compliance, particularly with respect to his failed attempts to lose weight. *See, e.g., Carprue v. Colvin*, No. 2:12-CV-288, 2014 WL 1319469 *10 (N.D.IN, March 31, 2014) (general medical recommendation to "lose weight" or "get exercise" is not prescribed treatment pursuant to SSR 02-1p at *9 and thus, failure to lose weight under such conditions does not indicate noncompliance with treatment). Additionally, the fact that a claimant traveled at the time he was claiming disability does not by itself indicate that he is not credible. *Murphy v. Colvin*, 759 F.3d

at 817 (finding that a relaxing vacation as described by claimant did not undermine her claim of disability). On remand, the ALJ should revisit her determination of Mr. Alevras' credibility using the guidance we have provided.

## CONCLUSION

For the foregoing reasons, we grant Mr. Alevras' motion for reversal and remand (doc. #18), and deny the Commissioner's motion (doc. #25). This case is remanded for further proceedings consistent with this opinion. The case is terminated.

**ENTER:**

*[signature]*

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATED: May 6, 2015**